In re **MAZAMA TIMBER PRODUCTS, INC., an Oregon corporation, dba Emerald Valley Golf Course; Emerald Valley Health Club; Emerald Valley Sports Center; Emerald Valley Forrest Inn, Debtor.**

**Bankruptcy No. 683–07505–W11.**

United States Bankruptcy Court, D. Oregon.

June 20, 1986.

See also 34 B.R. 556.

Wilson C. Muhlheim, Hershner, Hunter, Miller, Moulton & Andrews, P.C., Eugene, Or., for debtor.

Thomas Huntsberger, Springfield, Or., for trustee.

Albert N. Kennedy, Tonkon, Torp, Galen, Marmaduke & Booth, Portland, Or., for Oregon Bank's (creditor).

## MEMORANDUM OPINION

POLLY S. WILHARDT, Bankruptcy Judge.

On July 19, 1985, The Oregon Bank (hereinafter TOB) filed a motion for determination of secured status. This filing was the culmination of years of complex business transactions, both pre- and post-petition, between TOB and the debtor (hereinafter Mazama). The motion requests the court to find the extent of TOB's entitlement to adequate protection and enter an order requiring transfer to it of property sufficient to satisfy that entitlement. The motion does not request the court find any transfer be granted administrative claim

status with priority under the provisions of 11 U.S.C. § 507(b). That is because by the terms of the financing order establishing adequate protection for TOB it was granted a first security interest in all pre- and post-petition estate property. Thus any property the court finds the transfer of which is necessary to provide the bank with adequate protection would be transferred to the bank in the form of collateral it already had been granted rather than in the form of a priority administrative expense payment.

The relevant facts on which there is no disagreement are as follows:

1. Mazama filed for relief under Chapter 11 on May 10, 1983.

2. On May 10, 1983, Mazama was indebted to TOB in the principal sum of $12,971,447 plus accrued interest of $1,183,475, plus accrued expenses of $37,-627, for a total of $14,192,549. TOB was an undersecured creditor of this estate on May 10, 1983.

3. To evidence said indebtedness and to secure such obligations, Mazama had, prior to the commencement of this case, executed numerous loan documents, including promissory notes, security agreements and UCC financing statements, and granted to TOB security interests in various assets, including, without limitation, lands, buildings, machinery, equipment, fixtures, trade fixtures, timber, inventories of logs and lumber products, all existing and future accounts, contract rights, chattel papers, documents, instruments, general intangibles, and products and proceeds of the foregoing. TOB's security interests in such assets were properly perfected.

4. On May 11, 1983, Mazama and TOB entered into a financing order to permit Mazama to use cash collateral and other assets encumbered in favor of TOB for a 90-day period in exchange for Mazama's commitment to provide adequate protection and to dispose of assets not necessary to its reorganization. At the end of the 90-day period, the parties proceeded as if the financing order had been informally extended.

5. The financing order provided that, among other things, Mazama grant to TOB first and prior security interests in all prepetition and post-petition property of the estate, including real properties, buildings, timber and timber contracts, all existing and after acquired accounts, accounts receivable, contract rights, chattel paper, general intangibles, rights to payment of kind, including right to tax refunds and rights in and claims under insurance policies and letters of credit, documents, instruments, leases, rents and profits, inventory, machinery, equipment, fixtures and trade fixtures, shares of capital stock, capital equities, and other securities of and in any corporation, and products and proceeds of the foregoing in order to afford to TOB adequate protection for the use of cash collateral and other collateral.

6. The financing order further provided that Mazama would use equipment and facilities only for intended purposes, would keep all purchase contracts and obligations secured thereby current, would maintain the equipment and keep it insured, and would pay TOB $30,000 per month as adequate protection for the use and depreciation of such equipment and facilities; that Mazama would pay TOB for the purpose of providing additional adequate protection interest at the rate of prime plus 4%, or 12%, whichever was lower, upon the outstanding indebtedness (this would amount to $141,-925 per month); that it would reimburse TOB for all costs and expenses incurred by TOB for the documentation of transactions contemplated by the financing order, including attorneys' fees and filing and recording fees; that it would pay for the costs of appraising real properties and other collateral "subject to the availability of collateral value"; that it would deposit all proceeds of cash collateral in a deposit account and that all such proceeds would be applied to its pre-petition indebtedness to TOB; that it would sell all assets unrelated to and unnecessary for the operations of its veneer plant and its reorganization; that "proceeds shall only be applied to security interests in order of priority.

No proceeds shall be applied except to secured debt."

7. Mazama failed to comply with various provisions of the financing order. It paid a total of $307,492.08 to TOB under its terms.

8. Between May 10, 1983, and April 16, 1984, Mazama was unable to reorganize and suffered substantial losses in the operation of its plants and in certain other operations, including the operation of the Emerald Valley Forrest Inn.

9. On April 16, 1984, pursuant to a settlement agreement entered into by the parties Mazama transferred title to TOB of the following properties:

a. Emerald Valley Forrest Inn
b. Christensen 1,000 A
c. Cunningham
d. Winchester Bay
e. Empire
f. Looney
g. Rock Creek
h. 26 acres of farmland
i. Land Sale Contract on Goshen Mill
j. Cottage Grove.

The agreement provided that the properties would be deeded free and clear of all liens and encumbrances except certain permitted liens and encumbrances having priority over the interest of TOB. All were so deeded except Cottage Grove.

10. Subsequently Mazama defaulted in the performance of its obligations under the settlement agreement. On January 7, 1985, this court entered its order granting TOB's motion for relief from automatic stay. Such order also required TOB to hold all proceeds it had collected or would collect from post-petition accounts and inventory in a separate interest bearing account pending future court determination of TOB's secured status and its right to such funds as adequate protection.

11. The court had previously determined the value of the properties subject to the lien of TOB as of the petition date as follows:

| Mazama Assets | Appraised Value 5/10/83 | Prior Liens | 5/10/83 Net Value |
|---|---|---|---|
| Emerald Valley Inn | $4,000,000 | $959,575 | $3,040,425 |
| Creswell Mill | 1,603,000 | 137,773 | 1,465,227 |
| Goshen Mill | 1,300,000 | –0– | 800,000 |
| Panda Pizza | –0– | –0– | –0– |
| Service Station | 100,000 | 4,087 | 95,913 |
| Christensen 1000A | 650,000 | 13,115 | 636,885 |
| Coburn | 120,000 | 752 | 119,248 |
| Cunningham | 140,000 | 58,634 | 81,366 |
| Cottage Grove | 228,000 | 94,600 | 133,400 |
| Winchester Bay | 115,000 | 3,304 | 111,696 |
| Empire | 50,000 | 2,265 | 47,735 |
| Napper | 72,000 | 61,900 | 10,100 |
| Brummet | –0– | –0– | –0– |
| Little Fall Creek | 75,000 | 76,905 | –0– |
| Looney | 110,000 | 90,513 | 19,487 |
| Rock Creek | 898,500 | –0– | 898,500 |
| Log Inventory | 132,585 | –0– | 132,585 |
| Veneer Inventory | 21,010 | –0– | 21,010 |
| Accounts Receivable | 149,537 | –0– | 149,537 |
| 26 Acres Farm Land | 53,000 | –0– | 53,000 |
| Cut Timber On: | | | |
|     Brummet | 32,891 | –0– | 32,891 |
|     Napper | 122,300 | –0– | 122,300 |
| Parts Inventory | –0– | –0– | –0– |
| Notes Receivable and Contracts | –0– | –0– | 20,000 |
| Lawsuit Against U.S.A. | –0– | –0– | –0– |
| Affiliate Accounts | –0– | –0– | –0– |
| | | | $7,991,305 |

11. As a result of the court's order granting its motion for relief from automatic stay TOB was able to obtain its interest in the following properties:

a. Creswell Mill

b. Panda Pizza

c. Service Station

d. Coburn

e. Napper

f. Brummet

g. Little Fall Creek

h. Log Inventory

i. Veneer Inventory

j. Accounts receivable

k. Cut timber on Brummet and Napper

l. Parts inventory

m. Notes receivable

n. Lawsuit against U.S.A.

o. Affiliate accounts

12. In its opinion dated January 7, 1985, this court found the period of time required to foreclose a mortgage on Oregon real estate is from 18–22 months. *In re Mazama Timber Products, Inc.*, No. 683–07505, slip op. at 19 (Bankr.D.Or. January 7, 1985).

13. The interest rate to be applied in determining the rights, if any, of TOB to adequate protection is 12% simple.

14. From and after May 10, 1983, Mazama did not pay any real or personal property taxes accruing on property of the estate and did not pay any interest on indebtedness secured by liens on property of the estate with priority over the liens of TOB. The following is a list of various properties of the estate and the amount of property taxes, exclusive of interest, or interest on mortgages or land contracts with priority over the mortgages of TOB that accrued during the pendency of the automatic stay or up to the date of deeding, whichever is relevant:

| Emerald Valley Inn | |
|---|---|
| — Property tax accrual | $78,539.67 |
| — Interest accrual on Murphy contract | 39,595.92 |
| — Interest accrual on Cully contract | 13,749.99 |
| Christensen, 1,000 acres | |
| — Property tax accrual | 2,996.36 |
| Coburn | |
| — Property tax accrual | 742.74 |
| Cunningham | |
| — Property tax accrual | 212.39 |
| — Interest accrual on Cunningham contract | 6,665.72 |
| Cottage Grove | |
| — Property tax accrual | 1,645.76 |
| Winchester Bay | |
| — Property tax accrual | 1,763.91 |
| Empire | |
| — Property tax accrual | 1,149.00 |
| Napper | |
| — Property tax accrual | 1,245.01 |
| — Gene Solomon loan, approximately | 9,000.00 |
| Looney | |
| — Property tax accrual | 306.32 |
| — Interest accrual on Looney contract | 7,731.31 |
| Rock Creek | |
| — Property tax accrual | 4,874.45 |
| 26 acres of farm land | |
| — Property tax accrual | 334.13 |

15. The values of the property conveyed under the terms of the settlement agreement as of April 16, 1984, on which the parties agree are:

| Asset | Value on 4/16/84 |
|---|---|
| Christensen | 552,500 |
| Cunningham | 68,850 |
| Empire | 42,500 |
| Cottage Grove | 110,000 |
| Looney | 17,000 |
| Rock Creek | 718,250 |
| 26 Acres | 42,000 |
| Goshen Mill | 815,359.08 |

These figures are net of all accrued items in paragraph 14.

16. The values of the property for which TOB was granted relief from the automatic stay, as of January 7, 1985, on which the parties agree are:

| Asset | Value on 1/7/85 or Amount Received by TOB upon Sale |
|---|---|
| Brummet | –0– |
| Coburn | $100,000 |
| Panda Pizza | –0– |
| Napper | –0– |
| Little Fall Creek | –0– |
| Cut Timber on Brummet & Napper | –0– |
| Notes Receivable & Contracts | –0– |
| Lawsuit | –0– |
| Affiliate Accounts | –0– |
| Accounts Receivable, Parts, Log & Veneer Inventory | Included in adequate protection reserve |

These figures are net of all accrued items in paragraph 14.

17. The present value of $1 at 12% per annum simple over 20 months is .83333.

18. On April 11, 1985, TOB finalized a sale to Bald Knob Timber Company of the Creswell Mill. Prior thereto, on January 10, 1985, the parties had agreed Bald Knob would pay TOB $6,000 per week commencing January 7, 1985, as lease payments for use of the Mill. The court has been unable to locate any documents tendered to it which describe exact credits given Bald Knob toward the purchase price of the Mill for these lease payments although the parties agree such credits were given. Under the sales agreement Bald Knob paid $1,000,000 for personal property and $1,137,183.42 for real property and improvements. Pursuant to the sales agreement unpaid real property taxes equaling $287,716.71 were to be paid out of the $1,137,183.42. Pursuant to the bill of sale on the personal property TOB agreed to indemnify Bald Knob from any liens against the personal property with certain exceptions. Covered by the sale were TOB's rights to all receivables and inventory in existence at the mill or that were subsequently collected by TOB. These receivables are $338,572.45 plus interest and are the same post-petition receivables the court on January 7, 1985, ordered TOB to hold pending further determination. Pursuant to the terms of the sale Bald Knob was to pay an installment of $500,000 (Paragraph 3.3 of Sale Agreement). Pursuant to Paragraph 22 of the sales agreement, in the event this court finds TOB to be entitled to any part of these receivables as part of its adequate protection that amount is to be credited to the indebtedness of Bald Knob to TOB and reduce the $500,000 to that extent. In the event Bald Knob shall have already paid TOB $500,000 prior to this court's determination then TOB is to pay Bald Knob any sum it is found by the court to be entitled to.

19. TOB received $97,000 in exchange for the assignment of its position on the service station. It received $3,000 rental off the property before this assignment.

20. No funds are due TOB for adequate protection arising out of the transfer of properties pursuant to the April 16, 1984, settlement agreement except perhaps with regard to Cottage Grove. That is because those properties were deeded free and clear to TOB in 11 months. As a foreclosure would have taken 20 months the bank did not suffer any loss as a result of the imposition of the automatic stay.

The property conveyed by the settlement agreement, the values of which, as of April 16, 1984, the parties could not agree on, are Emerald Valley Forrest Inn and Winchester Bay. With regard to the properties for which TOB was granted relief from the automatic stay the court must make two factual findings. First, whether it is appropriate, for purposes of determining the amount TOB received from its sale of the Creswell Mill, to deduct the amount of the post-petition receivables TOB collected. Second, whether the lease payment from the service station of $3,000 TOB received should be credited towards the adequate protection of TOB.

This case presents the court with a complex, and hopefully unique, question which arises out of the unusual facts of this case. The question has arisen because of the requirement, in the Ninth Circuit, for bankruptcy courts to assure adequate protection to a creditor not only of any reduction in the *value* of the collateral caused by the delay imposed by the automatic stay, but also of any loss of prospective return from reinvestment of the collateral proceeds caused by that delay. *Crocker Nat'l Bank v. American Mariner Industries, Inc. (In*

*re American Mariner Industries, Inc.)* 734 F.2d 426 (9th Cir.1984). Famous footnote 12 points out "to avoid overcompensating the secured creditor, the timing of adequate protection should take account of the usual time and expense involved in repossession and sale of collateral." *Id.* at 435.

The parties agree *American Mariner* requires the debtor to protect the creditor's *total* interest in the collateral, which encompasses more than just its value. Their dispute centers on what is the more appropriate method, under the facts of this case, to calculate the payments which are needed to protect TOB's property interest in the nature of the right to take possession of the collateral and sell it. The *Mariner* court did not put forth any mathematical formulas for use in calculating compensation for receipt in the future of that which the creditor would have received, but for the stay, at present. It recognizes "[I]nterest is indeed the common measure of the difference ..." *Id.* at 433. At several points it refers to compensating for "present value." *Id.* at 428, 428 n. 2, 432, 433, 434. It states the creditor should receive, to the extent possible, in value essentially what he bargained for. *Id.* at 431. It points out the Bankruptcy Code, at § 1129(b)(2)(A)(i)(II) incorporates recognition of payment of interest for the time value of money. I note in passing this concept is also recognized in § 1129(a)(9)(C) and § 1129(a)(9)(B)(i). Under those sections the Code establishes a payment method whereby the market value of the interest to be protected as of the effective date of the plan is first established. Deferred payments are then required which will, over the stated term, pay that principal amount plus the amount the court or the parties determine reflects the return the creditor would have received in the market on that principal if it had been available for investment on the effective date. This method of computation is the method which TOB asserts is the appropriate one for this court to use in determining whether it has been adequately protected under the facts of this case, with the term being from May 10, 1983, to January 7, 1985. This calculation would apply only to the assets released to it by the automatic stay and as to Cottage Grove which was not deeded free and clear of all liens on April 16, 1984.

On the other hand, the trustee and the debtor argue that the method which more accurately reflects the intent of *American Mariner* in calculating the amount TOB received as adequate protection and the amount, if any, it should receive in additional protection, is first to discount the value of all estate assets as of May 10, 1983, by 20% (12% per annum for 20 months). This figure represents the present value of those assets to TOB in 20 months after the bank would have foreclosed on the properties, received clear title and been in a position to sell them, and generate funds to lend out at interest. The second step is to charge the debtor 12% on all assets from the date the petition was filed. The debtor is credited for each payment made and asset value transferred on the date made or transferred with application against the interest factor first. Interest on the assets transferred under the settlement agreement is paid only for the period May 10, 1983, to April 16, 1984; interest on the assets released from the stay is paid from May 10, 1983, to January 7, 1985. The debtor and trustee believe the transfer of substantial assets free and clear to TOB on April 16, 1984, nine months before it would otherwise have received the assets in that form had it been required to foreclose its mortgages should result in a credit to the debtor towards its adequate protection obligation. The form the credit takes is the difference between the discount on those assets (20%) and the 12% per annum interest the debtor paid on those assets for 11 months.

■ The court will address the facts which must be determined first. In December, 1984, this court received extended evidence regarding the value of the Emerald Valley Forrest Inn. At that time the evidence was presented to aid the court in arriving at a value for the Inn as of May 10, 1983. The three appraisals placed in

evidence were taken in July, 1983, May, 1982 and September, 1984. For purposes of this motion TOB would offer additional testimony the Inn has not depreciated or appreciated in value since May 10, 1983. The debtor and trustee argue that, although this court has earlier ruled values placed on property by the parties in the settlement agreement are not binding on either the parties or this court in determining issues of adequate protection, it is appropriate to place a value on the Emerald Valley Forrest Inn of $3,950,000 (net of all prior liens and encumbrances), the figure established in the settlement agreement, for purposes of this hearing. They make several arguments, equitable in nature, in support of this position which are based on the history of this case. This court rejects all such arguments, because I do not believe they play any relevant role in determining value. I believe I must, based solely on objective evidence regarding value, determine the value of a piece of real estate at a given point in time. Equitable arguments have their place. Their relevance regarding values is negligible. Whether the Inn has been run at a profit, a loss or at a breakeven point is a factor which I assume the appraisers and prospective buyers took into account. Based on the court's knowledge of the offers to purchase this property made in the spring 1984 and on the appraisal of September, 1984, and on the testimony TOB would offer, this court finds the value of the Inn as of April 16, 1984, to be $4,500,000. If the pre-petition and post-petition prior taxes and encumbrances are subtracted, the net value to be placed on the Inn for purposes of these calculations is $3,408,539.42.

The parties also were unable to agree on the value of Winchester Bay. The record is sparse on this point. At the January 22, 1986, hearing TOB stated the property was sold for a net sales price of $55,000. The trustee and debtor have presented no evidence of value. Thus, this court will find the value for purposes of these calculations as of April 16, 1984, to be $55,000. The court understands this was the net amount TOB received after payment of prior liens.

No party supported its position regarding the proper application of $3,000 rental TOB received from the service station with legal analyses. The rent represents a flow of income from the property. Under *American Mariner* this court must see the debtor accounts to the undersecured creditor for a "lost" flow of income off property not available to it. TOB received the benefit of those funds; the estate lost the availability of those funds for possible additional adequate protection payments. Under these circumstances I believe the $3,000 must be added to the amount TOB has received from the debtor in the form of "value" as of January 7, 1985.

TOB argues in order to determine the actual value to it of the Creswell Mill real estate and equipment this court must subtract from the sales price not only prior encumbrances but also the principal amount of the proceeds TOB collected from the additional collateral it was granted under the terms of the financing order, postpetition accounts and inventory. This amount is $338,572.45. The court can think of no logical basis for this position. Under the sales agreement Bald Knob Timber Company is bound to pay TOB the balance of the purchase price regardless of this court's decision regarding the appropriate distribution of these funds to either TOB or the trustee. These funds have been kept apart by court order and represent dollars to which TOB might or might not be entitled. At this point it has no vested right to them. It would be improper, then, for this court to subtract the amount of those funds from the purchase price *on the assumption* this court were to find TOB entitled to those funds and as a result of terms of a contract TOB entered after the court by order made it clear TOB did not, merely by means of the terms of the financing order, have a vested right in those funds.

The parties have not furnished the court with the exact amount Bald Knob Timber Company paid TOB for the Creswell Mill, including lease payments. When that fig-

ure is established there should be subtracted from it $287,716.71 representing real property taxes and the exact amount the parties can agree TOB paid as a result of its contractual responsibility to remove prior liens and encumbrances on the personal property. The balance is the proper amount to be credited to Mazama for adequate protection payments.

This court has spent many hours reviewing the calculations of both the debtor and creditor and rereading the *American Mariner* decision. First, I wanted to assure myself I understood exactly what the Ninth Circuit was concerned in protecting. I then attempted to choose that method of calculating the payments to be made by the debtor to the creditor which I believed most appropriately reflected those concerns.

I believe the debtor's method most accurately reflects the responsibilities *American Mariner* places on the debtor and the return *American Mariner* requires to the creditor.

*American Mariner* mentions in several places it is the *present value* (emphasis added) of the creditor's interest in the collateral which must be protected. The present value may or may not be the liquidation value of the assets on the date the petition is filed. If, *but for the stay*, the creditor were, on that day, able to take possession of the collateral, sell it and lend the proceeds out at interest the two values would be the same. But the facts in this case, and in most cases where the court is required to formulate adequate protection, reveal the creditor would not be able to do that. That is because the creditor must go through a foreclosure process before it translates the collateral into investment proceeds. *American Mariner* recognizes the debtor should not be required to pay adequate protection for this period because meanwhile the creditor through that period will not have been losing investment return.

■ The present value which the debtor must protect in this case is not $7,991,305. The present value which the debtor must protect is the discounted value of $7,991,-

305 discounted at the appropriate rate (here the parties agree it is 12% simple interest per annum) for the appropriate term (that period of time which the court finds would be required for the creditor to complete its foreclosure.) *American Mariner* recognizes the discounting concept " ... payment ten years hence is not generally the equivalent of payment now." *Id.* at 433 (*quoting In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir.1935) Learned Hand, J.). Or one can describe what the debtor must protect a slightly different way. The creditor's interest to be protected by *Mariner* payments is "the right to take possession of and sell collateral on the debtor's default." *Id.* at 435. The value of that right is not, in this case, $7,991,305. It is something less than that due to the delays of foreclosure.

*American Mariner* emphasizes the creditor, must, to the extent possible, get the benefit of its bargain. What was TOB's contractual right upon default regarding these assets? It was to take possession, foreclose and sell. It was to receive, *after foreclosure delays*, assets worth what they were worth on May 10, 1983. In a case like this where the assets are so numerous and valuable the distinction between paying on the present value of assets and on the liquidation value of assets becomes quite significant. If this court were to require the debtor to pay interest on the liquidation value of the collateral from May 10, 1983, as the creditor urges, I believe I would be making the debtor pay more than that to which the creditor is entitled under the facts of this case. Such payments would only be suitable if the facts were that, prior to imposition of the stay, TOB had repossessed and sold its collateral and was in a position to invest $7,991,305 on May 10, 1983.

TOB argues it must receive interest on its collateral now as, when the stay is lifted, it still faces a foreclosure period. There is no argument about that. The question is, receive interest *on what?* The court believes it must receive interest only on the value of what it held on May 10,

1983. That value is not $7,991,305. If a debtor pays interest on what the creditor holds on the bankruptcy petition, from that date until the stay is lifted, the creditor, at that time, will be in the same position it would have been in if the stay had not been imposed.

The bank argues Mazama's method for calculating adequate protection payments cannot be used until the end of a case. Only then do the parties and court have knowledge of all the elements necessary to make calculations under that method. This is true. Therefore this court does not anticipate that method will be used by courts in establishing initial adequate protection payments. For purposes of reaching initial determinations regarding adequate protection payments the bank's method is completely appropriate. But this court believes it is the most accurate method to use at the end of a case when the parties and the court know the case history. Although with facts as complex as these there is going to be some "slippage" the debtor's method provides a more accurate result in computing the amounts required for the bank's protection because it charges debits and applies credits on the date the transactions occurred. It is at the end of a case when the creditor, as did TOB, asks the court to supply the additional protection to which it believes it is entitled and did not earlier receive.

TOB also seems to be arguing that the debtor's method is inequitable because its bottom line indicates less payments to the bank than the bank's method. It states TOB finds itself in the position of being inadequately protected only because the debtor breached the financing order and the settlement agreement. The drafters of the Bankruptcy Code recognized that a reorganization effort might fail and provided the machinery to protect the secured creditor from resulting harm to the extent of the availability of estate assets. The machinery is the adequate protection procedure, including the granting of additional security, as was done here, making periodic payments and providing priority payment status (11 U.S.C. § 507(b)). We are in the middle of that procedure. Why we arrived at this point is irrelevant. The court's responsibility now is to see the creditor receives what it believes to be the adequate protection payments required by the Code and the case law interpreting it. The court has earlier indicated the values placed on the assets in the settlement agreement, for another purpose, at another time, and for which TOB gave consideration in the form of cancellation of debt, are not appropriate for use in making these adequate protection calculations.

TOB also argues its method is more consistent with bankruptcy practice. It refers to the use of a deferred payment schedule with interest to reflect a discount factor as required by 11 U.S.C. § 1129(b)(2)(A)(i)(II). The bank fails to note that under that statute the court assumes the "allowed amount of the claim" which is to be protected by the interest factor is *not* a discounted figure. That is, there is an assumption that but for the bankruptcy the creditor would be entitled to immediate possession and use of the amount of his claim. Our facts, on the other hand, force us to recognize the discount resulting from the time delay of possession and resale from foreclosure.

TOB's system is easier and does not require a computer to run the calculations. It is also less accurate. If the key factors are known and a computer is available accuracy must prevail.

■ The debtor's method provides the debtor with a "credit". This credit arises because, although the value of assets transferred to TOB on April 16, 1984, was discounted 20% Mazama paid 12% interest on those assets for only 11 months. The debtor makes the equitable argument that this crediting is fair because the bank received 72% of its collateral nine months earlier than it would have if it had had to foreclose on the properties. The court believes there is a more concrete reason why the debtor should not be required to pay interest on these properties after they were transferred to TOB. After transfer TOB

was in the position immediately to liquidate those properties and invest the proceeds. If they did so they would have been receiving the return on those investments *American Mariner* recognizes their right to. If the debtor continued to make a payment on the present value of those properties TOB would be, as to those properties deeded, in a position to receive a *double* investment benefit. The purpose of the debtor's payment is to substitute for investment return eliminated by the stay. With the property immediately available to the creditor for investment the *raison d être* for that payment ceases.

This would be true, however, only if the title to the properties, when transferred to the bank, allowed the bank to sell without delay. It is the court's understanding that was the case with all the deeded properties except Cottage Grove. The debtor should be required to pay 12% on the present value of Cottage Grove until the earlier of when the title to the property allowed the bank to liquidate it or January 7, 1985.

Footnote 12 in *American Mariner* indicates the court must consider "the *usual* (emphasis added) time ... involved in repossession and sale of collateral." *Id.* at 435. The debtor's method, by discounting all property by 20% (1% per month for 20 months) has assumed 20 months is the "usual" time involved in repossession and sale of each of its pre-petition assets. Although I do not believe *American Mariner* requires the court as TOB argues, to determine a discount to present value on *each* asset to reflect, after the fact, what actual time the creditor used to obtain possession and sell it. I do believe that the debtor's method inappropriately used the 20% discount for certain assets of personal property.

In its supplement to memorandum in support of the motion before the court filed by TOB on February 21, 1986, (after the court hearings on the motion and after the parties had stipulated to certain values), the bank initiated the argument that if this court were to approve the debtor's method of calculating adequate protection payments, for purposes of determining the term on which to base the discount the personal property and real estate of the Creswell Mill and Goshen Mill should be separately valued. It indicated for personal property values I could refer to appraisals on the personal property at the mills tendered to the court in December, 1984. The court must disregard this argument. First, the argument is untimely. It should have been raised at the hearing when both parties had an opportunity to address this question. Second, as pointed out by the debtor in a letter to the court dated February 21, 1986, there is no evidence the value of a mill is equal to the difference between the value of the real property and the value of the personal property. Third, there is no evidence before the court that TOB could, practically, even if legally, foreclose, repossess and sell the equipment and machinery of a mill before it had pursued the same procedures with the real estate upon which the personal property sat.

Referring to the list of assets Mazama owned on May 10, 1983, it appears it is improper to discount for 20 months the following items:

1. Log Inventory
2. Veneer Inventory
3. Accounts Receivable
4. Cut Timber on Brummet and Napper
5. Parts Inventory
6. Notes Receivable and Contracts
7. Lawsuit
8. Affiliate Accounts

The court shall require Mazama to run a new computer printout based on the decisions it has reached in this opinion. A copy of such printout should be supplied to the bank 5 days before it is filed with the court. The court encourages the parties to reach an agreement on the appropriate term for discounting the listed items of personal property. If agreement cannot be reached the court will schedule a hearing for the purpose of receiving evidence on this question. After the computer printout has been filed with the court, the court will

enter all necessary orders to address the matters raised by the bank's motion.

This Memorandum Opinion contains the court's findings of fact and conclusions of law and pursuant to Bankruptcy Rule 9014, which incorporates Rule 7052, they will not be separately stated.